**NORTHWEST AIRLINES, INC.**

v.

**AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, Appellant.**

No. 85–6228.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 10, 1986.

Decided Jan. 6, 1987.

Eugene B. Granof, with whom Gary Green, Washington, D.C., was on the brief for appellant.

William R. Stein, with whom Philip A. Lacovara and Patricia A. Dean, Washington, D.C., were on the brief for appellee.

Before EDWARDS and BORK, Circuit Judges, and SWYGERT,* Senior Circuit Judge for the United States Court of Appeals for the Seventh Circuit.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

In August 1982, following an alcohol-related incident, officials at Northwest Airlines, Inc. ("Northwest") discharged First Officer Larry Morrison. Subsequently, pursuant to a grievance filed by the Air Line Pilots Association ("ALPA"), a panel of the Northwest Airline System Board of Adjustment (the "Board") issued an arbitration award finding that, because the pilot was suffering from alcoholism, Northwest's discharge of Morrison was without "just cause" under the terms of the Northwest-ALPA collective bargaining agreement. The Board ruled that Morrison should be offered reinstatement, without back pay or benefits, upon certification by

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1982).

the Federal Air Surgeon that Morrison had recovered from the effects of his alcoholism, including total abstinence from alcohol for not less than two years. Morrison successfully completed an alcohol rehabilitation program and was thereafter recertified by the Federal Aviation Administration ("FAA") in 1985.

In 1985, Northwest filed a complaint in District Court seeking to set aside the Board's arbitration award. The District Court issued a summary judgment for Northwest, finding that the Board's award was inconsistent with public policy. ALPA now seeks review of the trial court's judgment, contending that the District Court acted in excess of its authority in overturning the Board's arbitration award. Because we find that the District Court had no valid basis upon which to set aside the Board's award, and because we hold that the trial court's decision is plainly at odds with well-established Supreme Court precedent and with this court's recent decision in *American Postal Workers Union v. United States Postal Service*, 789 F.2d 1 (D.C. Cir.1986), we reverse.

■ Generally, a labor arbitration award must be enforced if the arbitrator acts within the confines of his jurisdiction and his award draws its essence from the parties' collective bargaining agreement; this is so even when a reviewing court disagrees with the arbitrator's judgment on the merits. In some limited circumstances, an arbitration award may be set aside if it is found to be violative of "public policy." However, as we made clear in *Postal Workers*, "judges have no license to impose their own brand of justice in determining applicable public policy; thus, the exception applies only when the public policy emanates from clear statutory or case law, '*not from general considerations of supposed public interests.*'" *Id.* at 8 (emphasis in original). There can be no doubt that the Board's award in the instant case does not

require the invocation of a public policy exception; therefore, the District Court had no authority to substitute its judgment for that of the parties' lawfully designated arbitration panel. Accordingly, the District Court's order is hereby vacated and the case remanded with instructions to enter judgment in favor of the Air Line Pilots Association.

## I. BACKGROUND

Prior to his discharge, First Officer Larry Morrison had been with Northwest for sixteen years and had a theretofore unblemished disciplinary record. Morrison was dismissed by Northwest on August 6, 1982, after he was discovered piloting a Northwest flight within twenty-four hours after consuming alcohol. Morrison had been drinking during a thirty-hour stopover between flights and then had become ill three hours before his next scheduled flight. He asked to be replaced on his scheduled flight; however, after being informed that no replacements were available, Morrison agreed to serve as copilot for the first two legs of the flight, provided that he could be replaced on the final leg. At the first stopover, in San Francisco, Northwest officials insisted that Morrison submit to a blood test, which showed Morrison's blood alcohol level to be at .13%. Under California law, a blood alcohol level of .10% creates a presumption of intoxication,[1] and FAA regulations prohibit any person from serving as a crew member with a blood alcohol level of .04% or more.[2]

Northwest investigated the incident, and discharged Morrison for violating company regulations prohibiting the consumption of alcohol within twenty-four hours of flight duty, and for being under the influence of alcohol during the flight. Northwest prohibits crew members from using alcoholic beverages during the twenty-four-hour period immediately preceding the departure time of a flight to which that person has been assigned.[3] Violation of the rule may

---

1. *See Northwest Airlines, Inc. v. ALPA*, 633 F.Supp. 779, 782 n. 1 (D.D.C.1985), *reprinted in* Record Excerpts ("R.E.") 6, 9 n. 1.

2. 14 C.F.R. § 91.11(a)(4) (1986).

3. *See Northwest Airlines, Inc.*, 633 F.Supp at 785 n. 4, *reprinted in* R.E. 17 n. 4. FAA regulations require that a crew member abstain from drinking during the eight-hour period prior to a flight. 14 C.F.R. § 91.11(a)(1) (1986).

be grounds for discharge.[4] Northwest does, however, allow reformed alcoholics to be pilots.[5]

Morrison admitted to Northwest officials that he had a ten-year history of drinking, but until the incident of August 1, 1982, he had never sought treatment for his drinking problem, fearing that he would be discharged. He also admitted that he had probably violated the twenty-four-hour rule in the past. Immediately after being discharged by Northwest, Morrison successfully completed a comprehensive alcohol treatment program and has not consumed alcohol since.

A grievance was filed before the Board to determine whether Northwest's discharge of Morrison was for just cause, and, if not, what the appropriate remedy should be. During a two-day arbitration hearing, the parties attested that the matter was properly before the Board; the parties were then afforded full opportunity to offer evidence and argument and to present, examine and cross-examine witnesses. After considering the evidence before it and reviewing post-hearing briefs, the Board issued a written opinion, holding that the discharge was without just cause and that Morrison should be offered reinstatement, without back pay or benefits, at such time as the Federal Air Surgeon certified that he met the standards of 14 C.F.R. § 67.-13(d)(1)(i)(c) (1986).[6] Morrison was certified by the FAA on September 13, 1985.[7]

In reaching its decision, the Board considered and rejected several less severe remedies. For example, as of January 10, 1984, the FAA Federal Air Surgeon had declared Morrison to be eligible for a special issuance of a first-class medical certificate.[8] This would have permitted him to pilot commercial aircraft so long as he received periodic reports from Northwest, ALPA and his physician indicating that he had abstained from drinking alcohol. However, the Board declined to order Northwest to conditionally reinstate Morrison, insisting that Morrison meet the more stringent standard embodied in 14 C.F.R. § 67.13(d)(1)(i)(c).

The Board also declined to award any fringe benefits, including sick leave and medical leave, back pay or accumulation of longevity during Morrison's period of rehabilitation. It did so, in part, in recognition of the safety-related goals of the twenty-four-hour rule.[9] The Board took pains to point out that its decision "should not be construed to mean that the Company cannot, under its present policy, terminate rule violators who are found to be alcoholics.... Those alcoholics who do not come forward before breaking the rules are still subject, upon a full review of the facts and their medical condition, to the severest of

---

4. See Northwest Airlines, Inc., 633 F.Supp. at 785 n. 4, reprinted in R.E. 17 n. 4.

5. Id. at 785, reprinted in R.E. 18.

6. Section 67.13(d)(1)(i)(c) provides that a pilot may not have an established medical history or clinical diagnosis of

(c) Alcoholism, unless there is established clinical evidence, satisfactory to the Federal Air Surgeon, of recovery, including sustained total abstinence from alcohol for not less than the preceding 2 years. As used in this section, "alcoholism" means a condition in which a person's intake of alcohol is great enough to damage physical health or personal or social functioning, or when alcohol has become a prerequisite to normal functioning.

7. See Northwest Airlines, Inc. v. FAA, 795 F.2d 195, 200 (D.C.Cir.1986).

8. Northwest Airlines, Inc. v. ALPA, No. 82–23, slip op. at 39 (Oct. 29, 1984) ("Board Op."),

reprinted in R.E. 53, 91. 14 C.F.R. § 67.19 (1986) provides in pertinent part:

(a) At the discretion of the Federal Air Surgeon, a medical certificate may be issued to an applicant ... if the applicant shows to the satisfaction of the Federal Air Surgeon that the duties authorized by the class of medical certificate applied for can be performed without endangering air commerce during the period in which the certificate would be in force. The Federal Air Surgeon may authorize a special medical flight test, practical test, or medical evaluation for this purpose.

....

(d) In issuing a medical certificate under this section, the Federal Air Surgeon may do any or all of the following:

(1) Limit the duration of the certificate.

(2) Condition the continued effect of the certificate on the results of subsequent medical tests, examinations, or evaluations.

....

9. See Board Op. at 41, reprinted in R.E. 93.

consequences, including termination."[10] Thus, the Board's ruling was limited to the facts before it and was not a rejection of the twenty-four-hour rule. The Board concluded its decision as follows:

> Inasmuch as the Federal Air Surgeon has the statutory authority to make [medical fitness] determinations and must do so with the highest regard for air safety, the Chairman is of the opinion that the award herein is consistent with public policy and within the Board's authority to make.[11]

Northwest filed a complaint in the District Court seeking to set aside the award. ALPA responded by seeking enforcement of the award. On cross-motions for summary judgment, the District Court held for Northwest.[12] The trial court viewed the case as placing two federal policies in conflict. On the one hand, the trial judge recognized that there is a clear federal policy in favor of resolving labor disputes through arbitration.[13] However, the judge saw the Board's award as inconsistent with the federal duty imposed on airlines to ensure airline safety. The court held that the remedy arrived at by the Board impermissibly impinged on Northwest's duty to ensure air safety.[14] The District Court apparently gave no credence to the fact that the parties' agreement to arbitrate does not exclude safety-related grievances. Indeed, even though the parties' collective bargaining agreement plainly gives the Board the authority to review all employee dismissals, and to mitigate disciplinary penalties found to be without just cause, the trial judge inexplicably thought that the better course would be to leave Northwest free to implement its safety policy.[15] ALPA now contends that the District Court acted in excess of its authority in substituting its judgment for that of the Board.

## II. ANALYSIS

There are two principal issues in this case: (1) whether the Board had the authority to consider whether Northwest had "just cause" to dismiss Morrison and (2) whether the Board's decision, if within its jurisdiction, was contrary to public policy. Because the Board clearly had jurisdiction to decide this issue and because its decision was not contrary to public policy, the Board's award must be enforced.

### A. Scope of the Board's Jurisdiction

The requirement of grievance arbitration through Boards of Adjustment in the airline industry, and judicial review thereof, are specifically addressed in the Railway Labor Act ("RLA").[16] Under 45 U.S.C. § 184 (1982), "[t]he disputes between an employee ... and a carrier ... growing out of grievances, or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions ... may be referred by petition of the parties or by either party to an appropriate adjustment board." Moreover, "[i]t shall be the duty of every carrier and of its employees ... to establish a board of adjustment" to hear and resolve contract grievance disputes. *Id.*

The RLA provides further that Board awards "shall be final and binding upon both parties to the dispute."[17] In reviewing an arbitration decision under the RLA, a district court "may not ... set aside [an award] except for failure of the [Board] to comply with the requirements of [law], for failure of the order to conform, or confine itself, to matters within the scope of the [Board's] jurisdiction, or for fraud or corruption by a member of the [Board] making the order."[18] This standard has been described as "amongst the narrowest known to the law."[19] And as the Supreme Court has put it:

---

10. *Id.* at 42, *reprinted in* R.E. 94.

11. *Id.* at 43–44, *reprinted in* R.E. 95–96.

12. *Northwest Airlines, Inc. v. ALPA,* 633 F.Supp. 779 (D.D.C.1985), *reprinted in* R.E. 6.

13. *Id.* at 789, *reprinted in* R.E. 28.

14. *Id.* at 795, *reprinted in* R.E. 41.

15. *Id.*

16. 45 U.S.C. §§ 151–188 (1982). Portions of the RLA have been made applicable to airlines. *See* 45 U.S.C. § 181 (1982).

17. 45 U.S.C. § 153 First (m) (1982).

18. 45 U.S.C. § 153 First (p) (1982).

19. *Diamond v. Terminal Ry. Ala. State Docks,* 421 F.2d 228, 233 (5th Cir.1970).

The dispositive question is whether the party's objections to the ... Board's decision fall within any of the three limited categories of review provided for in the Railway Labor Act.... We have time and again emphasized that this statutory language means just what it says.[20] The only point at issue in this case is whether the Board's decision falls within the scope of its jurisdiction.

■ Upon review of the parties' collective bargaining agreement, there can be no serious doubt regarding the Board's authority to review Morrison's discharge. Section 3.A.3. of the applicable Northwest-ALPA collective bargaining agreement states that a pilot may be "discharged for just cause."[21] Under Section 19.B. of the parties' agreement, any pilot who is disciplined or dismissed by Northwest has "the right to appeal to the 'Northwest Airlines Pilots' System Board of Adjustment,' as provided in Section 21, provided such appeal is made within thirty (30) days from the date of receipt by the pilot ... of the decision of the Company."[22] And, under Section 21.D., the Board has "jurisdiction over disputes between any employee covered by the Pilots' Agreement and the Company growing out of grievances or out of interpretation or application of any of the terms of the Pilots' Agreement."[23] It is absolutely clear, from these explicit terms of the agreement, that an unresolved grievance claiming the absence of "just cause" with respect to a disciplinary action taken against a pilot is a "dispute" within the jurisdiction of the Board. It is also clear under Section 21.J. of the agreement that the decision of the Board with respect to such a "dispute" "shall be final, binding and conclusive between the Company and the Association and anyone they may represent having an interest in the dispute."[24]

■ In view of the foregoing provisions, the conclusion is inescapable that the Board acted within its authority in considering Morrison's claim that he had been fired without "just cause." And in reviewing this grievance, it is equally plain that the Board was authorized to judge the legitimacy of the disciplinary penalty imposed in the light of mitigating circumstances. This is hardly surprising because "[a]rbitral determination not only of the existence of misconduct but of the fitness of the punishment is routinely grist for the arbitral mill."[25] The fact that the arbitration touches on issues related to airline safety is irrelevant. There have been numerous arbitrations under the RLA involving grievances that implicate safety issues, and no court has ever ruled that an arbitral board lacked jurisdiction to consider such issues.[26]

■ There is *nothing* in the parties' agreement that even suggests that a disciplinary action related to an alleged breach of a safety rule is excluded from arbitral review. Indeed, quite the contrary is true because *all* disciplinary actions taken pursuant to Section 19 are made subject to Board review under Section 21. There is no conceivable way to construe the parties'

20. *Union Pac. R.R. v. Sheehan*, 439 U.S. 89, 93, 99 S.Ct. 399, 402, 58 L.Ed.2d 354 (1978) (referring to identical language in 45 U.S.C. § 153 First (q) (1982)).

21. Agreement Between Northwest Airlines, Inc. and the Air Line Pilots, *reprinted in* Record Before the System Board of Adjustment (Vol. II) Tab 7.

22. *Id.*

23. *Id.*

24. *Id.*

25. *Gulf States Tel. Co. v. Local 1692, Int'l Bhd. of Elec. Workers*, 416 F.2d 198, 202 n. 10 (5th Cir.1969).

26. *See, e.g., Association of Professional Flight Attendants v. American Airlines, Inc.*, 767 F.2d 1331 (9th Cir.1985); *ALPA v. Eastern Air Lines, Inc.*, 632 F.2d 1321 (5th Cir.1980); *World Airways, Inc. v. International Bhd. of Teamsters, Airline Div.*, 578 F.2d 800 (9th Cir.1978); *Northwest Airlines, Inc. v. ALPA*, 373 F.2d 136 (8th Cir.), *cert. denied*, 389 U.S. 827, 88 S.Ct. 77, 19 L.Ed.2d 83 (1967). Although the *World Airways* court held that the arbitrator exceeded his authority, 578 F.2d at 801, the Ninth Circuit clarified its *World Airways* holding in *American Airlines*, 767 F.2d at 1334, stating that it was the arbitrator's *remedy* in *World Airways* that was inappropriate: "That is, it was the remedy ordered that went beyond the arbitrator's authority, not the mere consideration of the safety issue. A less intrusive remedy might well have fared differently."

agreement as removing from the Board's jurisdiction disciplinary actions related to alleged breaches of the twenty-four-hour rule. Moreover, even if we could find some ambiguity in the parties' agreement, our decision would be the same. The Supreme Court has made it clear that, "[b]ecause the authority of arbitrators is a subject of collective bargaining, just as any other contractual provision, the scope of the arbitrator's authority is itself a question of contract interpretation that the parties have delegated to the arbitrator." [27] So long as the arbitrator's decision "draws its essence from the collective bargaining agreement," [28] it must be enforced. In the instant case, the Board considered a matter within its jurisdiction and the award was based solely upon the Board's construction of the collective bargaining agreement; therefore, because the award is not otherwise inconsistent with the law, it cannot be overturned by a reviewing court.

■ There is no support for the District Court's imposition of a presumption against arbitration of safety issues. Indeed, the precedent is to the contrary. The Supreme Court, most recently in *AT & T Technologies, Inc. v. Communications Workers*,[29] has clearly stated that doubts about the arbitrability of issues should be resolved in favor of coverage:

> Finally, where it has been established that where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." Such a presumption is particularly applicable where the clause is as broad as the one employed in

this case, which provides for arbitration of "any differences arising with respect to the interpretation of this contract or the performance of any obligation hereunder...." In such cases, "[i]n the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail."

In this case, Northwest has not introduced *anything* to suggest that this issue was *not* subject to arbitration, let alone provided "positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." In all critical respects, then, this case involves a straightforward application of well-established law concerning the *limited* role of the courts in reviewing labor arbitration awards:

> The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for.
>
> The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious.[30]

27. *W.R. Grace & Co. v. Local 759, Int'l Union, United Rubber, Cork, Linoleum & Plastic Workers*, 461 U.S. 757, 765, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983).

28. *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960).

29. —— U.S. ——, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986) (citation omitted) (quoting *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83, 584–85, 80 S.Ct. 1347, 1352–53, 1353–54, 4 L.Ed.2d 1409 (1960)).

30. *Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 567–68, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960) (footnote omitted).

## B. *Public Policy*

█ Although it is clear that the Board acted within the scope of its authority and that its award draws its esssence from the agreement, Northwest suggests that the Board's decision is somehow contrary to public policy, and that, because of this, the Board's decision should not be enforced. This contention is meritless.

In *American Postal Workers Union v. United States Postal Service,*[31] we recently addressed the extent to which an arbitration award may be vacated on the ground of "public policy." In *Postal Workers,* we explained the "public policy exception" as follows:

[I]t is well-understood that courts will not enforce an arbitration award if the award itself violates established law or seeks to compel some unlawful action. However, this rule, which is sometimes referred to as a public policy exception, is *extremely narrow.* In *W.R. Grace,* the Supreme Court has explained that, in order to provide the basis for an exception, the public policy in question "must be well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" Obviously, the exception is designed to be narrow so as to limit potentially intrusive judicial review of arbitration awards under the guise of "public policy."

... [I]t is plain from the language in *W.R. Grace* itself that the Court meant to say only that an arbitration award may not be enforced if it transgresses "well defined" and "dominant" "laws and legal precedents." It is also clear from the opinion in *W.R. Grace* that judges have no license to impose their own brand of justice in determining applicable public policy; thus, the exception applies only when the public policy emanates from clear statutory or case law, *"not from general considerations of supposed public interests."* [32]

Under this principle of "public policy," there is no basis upon which to set aside the Board's award in this case.

The Board's decision merely required Northwest to reinstate Morrison if and when he was recertified by the FAA as fully fit and licensed to fly. The award plainly is not unlawful in its determination that Morrison's alcoholism was an illness that could not support a finding of "just cause" for dismissal in this case. Indeed, even Northwest has a policy of allowing reformed alcoholics to fly as pilots, and there is nothing in the law prohibiting such a result.

Furthermore, the Board's award was conditioned upon a finding by the FAA— *i.e.,* the authorized public agency responsible for licensing pilots—that Morrison was fit and qualified to fly. To suggest that the Board's award violates public policy is to contend that the FAA was derelict in its responsibilities in considering Morrison for recertification. Obviously, it would be patently absurd for us, under the guise of "public policy," to reverse an arbitration award that is expressly limited by deference to the ultimate judgment of the agency that is charged with the enforcement of the public policy here at issue. Unless the FAA's decision to recertify Morrison is overturned pursuant to some lawful administrative or judicial proceeding designed to consider such matters, we must assume the legitimacy of Morrison's recertification. It would be the height of judicial chutzpah for us to second-guess the present judgment of the FAA recertifying Morrison for flight duty. At its core, Northwest's argument seeks just such a result, which would require this court to impose its "own brand of justice in determining applicable public policy." We decline the invitation.

We understand that Northwest has an interest in applying reasonable safety rules to its pilots. However, it is not the role of the courts to alter the labor-management balance struck in the collective bargaining agreement. Northwest is free to negotiate

---

**31.** 789 F.2d 1 (D.C.Cir.1986).

**32.** *Postal Workers,* 789 F.2d at 8 (quoting *W.R. Grace,* 461 U.S. at 766, 103 S.Ct. at 2183 (quoting *Muschany v. United States,* 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945))) (emphasis in original) (footnotes omitted).

with ALPA to remove the application of safety rules from the jurisdiction of the Board or to reduce the amount of discretion given to the Board on such matters. Alternatively, if Northwest believes the FAA's certification standards to be lax, it can lobby the FAA to change its standards or seek statutory relief from Congress. But, so long as the Board acts within its jurisdiction and its awards draw their essence from the collective bargaining agreement, and neither contravene established law nor require an unlawful act, *Enterprise Wheel, W.R. Grace, Postal Workers* and like precedent under the RLA compel that such awards be enforced.[33]

### III. CONCLUSION

For the reasons set forth above, the judgment of the District Court is reversed. The case is remanded to the trial court with instructions to enter judgment for the appellant.

*So ordered.*

---

**33.** Without assessing its relevance, we note that this is not a situation in which the Board has permitted a drunkard to pilot an aircraft, nor did it treat lightly the fact that Morrison had flown an aircraft while under the influence of alcohol. The Board carefully considered all safety issues and applied stringent prerequisites to allowing Morrison to fly again. Indeed, if Morrison had been an alcoholic, and had not been shown to have violated the 24–hour rule, Northwest concedes that the company would have allowed him to return to his position following FAA certification. The only issue before the Board was whether the added fact that Morrison had been found to have violated the 24–hour rule should alter the result. After careful deliberation, the Board concluded that, in this case, it should not.