**IOWA ELECTRIC LIGHT AND POWER COMPANY, Appellee,**

v.

**LOCAL UNION 204 OF the INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS (AFL–CIO); Grievant Don Schott, Appellants.**

**LOCAL UNION 204 OF the INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, Appellant,**

v.

**IOWA ELECTRIC LIGHT AND POWER COMPANY, Appellee.**

Nos. 87–1425, 87–1426.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 1, 1987.

Decided Dec. 14, 1987.

Joseph Day, Cedar Rapids, Iowa, for appellants.

John V. Ryan, Cedar Rapids, Iowa, for appellee.

Before HEANEY, BOWMAN, and WOLLMAN, Circuit Judges.

BOWMAN, Circuit Judge.

This case is an appeal of a District Court ruling which overturned a labor arbitration award. The award called for the reinstatement of a nuclear power plant machinist who had been discharged for deliberately violating important federally-mandated safety regulations. The District Court[1] vacated the arbitrator's award on public policy grounds. We affirm.

The appellee, Iowa Electric Light and Power Company (Company), employed Don Schott under a collective bargaining agreement with appellant International Brotherhood of Electrical Workers, Local 204, AFL–CIO (Union). Schott was employed in the machine shop area of the Company's federally-licensed nuclear power plant for six years. He had taken and passed intensive courses concerning the dangers of his occupation and the safety measures required by federal law.

The machine shop where Schott worked is within the plant's secondary containment area—a buffer zone designed to arrest the spread of any radiation that might escape from the primary containment area at the core of the reactor. The reactor building, including the machine shop, must be kept pressurized to ensure that any leakage remains inside the plant. Pressure is main-

1. The Honorable David R. Hansen, United States District Judge for the Northern District of Iowa.

tained by a series of interlock doors, designed so that only one door in each airlock compartment may be opened at a time. Each door is designated with an orange caution sign and a red warning light. When one door is opened, the red lights beside all the others flash on, indicating that the doors are automatically locked until the first one is closed. The machine shop doors are among those controlled by this interlock network. The only way an employee in the machine shop can defeat the system and open a door that has been automatically secured is to have someone outside the door pull a fuse from the interlock mechanism.

The events leading up to the discharge of Schott occurred in August, 1984. At that time, Schott had a cast on one of his legs as the result of a recent accident. His mobility decreased, Schott liked to leave early for lunch to avoid the noon crowd. On August 21 at 11:45 a.m., Schott tried to exit for lunch, but found that the interlock door leading from the machine shop to the railroad truck shed next door was locked. Unable to open the door to go through the shed on his way to lunch, Schott contacted a labor foreman on the other side by intercom and asked him to help get the door open. Apparently Schott thought that another door might have been left open inadvertently. After learning that the interlock was properly activated because a truck was standing in the shed doors, Schott called an engineer in the control room and requested permission to defeat the system so he could open the door. The engineer said no. Nevertheless, Schott told the foreman in the shed to pull the fuse. The foreman proceeded to disconnect the fuse as he was told, the door opened, and Schott walked into the shed. Thus, Schott deliberately defied the control room engineer, defeated the interlock system, and flouted federally-mandated safety regulations.

Three days later, after an investigation, the Company fired Schott (and the foreman) for "violating secondary containment." The discharges were approved in a report by government officials at the Nuclear Regulatory Commission (NRC). Schott and his Union thereafter followed the grievance procedures set forth in the Union's collective bargaining agreement with the Company. Pursuant to the agreement, a hearing was held before an independent arbitrator to determine whether the Company had "just cause" to discharge Schott. The arbitrator found that although Schott's act was "deliberate, improper, foolish and thoughtless," his termination was "too severe" and not justified under the "total circumstances of the case." Arbitration Decision at 7. The arbitrator ordered the Company to reinstate Schott, finding that he was not aware that "the situation was as grave a matter as that claimed by the company" and that "the various training sessions ... did not address the door problem ... that specifically...." *Id.* However, the arbitrator also noted that "[t]he general purpose of the interlock door system ... is well known," and that the "grievant was fully aware he was not to disable the door.... His act in causing the fuse to be removed was therefore a deliberate violation...." *Id.*

■ We are not concerned with what Schott says he did not know about the details of secondary containment. It is enough that he did know that he was short-circuiting an important safety system required by the federal government as a measure to protect the public from exposure to harmful radiation. Even if we construe the arbitrator's findings of fact in a light most favorable to the Union, we agree with the District Court that enforcement of the award returning Schott to work would violate the public policy of this nation concerning strict compliance with safety regulations at nuclear facilities.

■ We do not, nor did the District Court, lightly invoke the public policy exception to the rule of judicial deference to arbitrators' decisions. This Court has resisted the temptation to tamper with labor awards that we might have decided differently were we the arbitrator, and we have consistently observed that "[j]udicial review of an arbitrator's award is extremely limited...." *Manhattan Coffee Co. v. International Bhd. of Teamsters, Local No.*

*688*, 743 F.2d 621, 624 (8th Cir.1984), *cert. denied*, 471 U.S. 1100, 105 S.Ct. 2323, 85 L.Ed.2d 842 (1985). *Accord Stroh Container Co. v. Delphi Indus.*, 783 F.2d 743, 750–51 (8th Cir.), *cert. denied*, 476 U.S. 1141, 106 S.Ct. 2249, 90 L.Ed.2d 695 (1986); *Daniel Constr. Co. v. International Union of Operating Eng'rs, Local 513*, 738 F.2d 296, 299 (8th Cir.1984). In short, the decision of an arbitrator who has not exceeded his contractual authority is almost always upheld. In this case, the arbitrator's authority is not disputed. Even so, we agree with the District Court that the arbitrator's award cannot withstand scrutiny under the narrow public policy exception articulated by the Supreme Court in *W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber Workers*, 461 U.S. 757, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983).

■ "If the contract as interpreted by [the arbitrator] violates some explicit public policy, we are obliged to refrain from enforcing it." *Id.* at 766, 103 S.Ct. at 2183. Because collective bargaining agreements do not formulate public policy, and arbitrators cannot consider matters not encompassed by the governing agreements, "the question of public policy is ultimately one for resolution by the courts." *Id.* Once

the public policy question is raised, we must answer it by taking the facts as found by the arbitrator, but reviewing his conclusions de novo. *E.I. DuPont de Nemours & Co. v. Grasselli Employees Indep. Ass'n*, 790 F.2d 611, 617 (7th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 186, 93 L.Ed.2d 120 (1986). Most importantly, our considerations must be based only on public policy that is "well defined and dominant, and ... ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *W.R. Grace*, 461 U.S. at 766, 103 S.Ct. at 2183 (quoting *Muschany v. United States*, 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945)).[2]

■ Appellant in the instant case contends that there is no "well defined and dominant" public policy specifying that workers who violate secondary containment at nuclear power plants must be fired. We conclude, however, that there is a well defined and dominant national policy requiring strict adherence to nuclear safety rules. Moreover, we conclude that this strong public policy would be violated by judicial enforcement of an arbitrator's award requiring the reinstatement of an employee who acted as Schott did under the circumstances of this case.[3]

**2.** The Supreme Court recently re-emphasized the narrow *W.R. Grace* standards for rejecting arbitration awards on public policy grounds in *United Paperworkers Int'l Union v. Misco, Inc.*, —— U.S. ——, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). The Court of Appeals had affirmed the District Court, which had vacated on public policy grounds an arbitrator's award reinstating the operator of dangerous machinery who was found, during a work break, sitting in a car with a lighted marijuana cigarette in the ashtray. The Supreme Court reversed the decision by the divided three- judge panel and upheld the arbitration award. The Court held that the award should not have been vacated because, among other reasons, the "Court of Appeals made no attempt to review existing laws and legal precedents in order to demonstrate that they establish a 'well defined and dominant' policy...." *Id.*, at 374. The Supreme Court also observed that the Court of Appeals had "inappropriate[ly]" drawn factual inferences from evidence rejected by the arbitrator. *Id.* Furthermore, the Supreme Court said that even if the company could prove that its employee had possessed marijuana in violation of company rules, mere possession

of drugs does not necessarily offend the "public policy identified by the Court of Appeals 'against the operation of dangerous machinery by persons under the influence of drugs or alcohol.'" *Id.* (citation omitted) In contrast to the safety rules for the United Paperworkers—designed to protect employees inside the paper converting plant—are the safety rules that Schott violated at Iowa Electric—designed to protect not only employees, but also the general public. The public policy at stake in the two cases is simply not the same, as is evidenced by the fact that there is no federal regulatory agency specifically charged with overseeing the safe production of paper, as the NRC does for nuclear power. *See infra*, at 1428.

**3.** This Court is not required to find that the award itself is illegal before we overrule the arbitrator on public policy grounds. The Supreme Court in *United Paperworkers* declined to reach the issue of whether such a requirement is to be read into the public policy exception. "We need not address the Union's position that

From the very beginning of the nuclear power industry, the safety of nuclear power plants has been a matter of public concern. The federal government has been heavily involved in the planning, construction, and operation of nuclear plants since the enactment of the Atomic Energy Act and creation of the Atomic Energy Commission (AEC) in 1954. The NRC, the successor to the AEC, has promulgated volumes of safety rules that govern all nuclear power plants. *See, e.g.,* 42 U.S.C. § 2131–41; 10 C.F.R. pt. 50. Each plant, in turn, develops its own more detailed specifications and regulations in order to obtain and then maintain its federal license. For example, the Company's Technical Specification Section 3.7.c.1 lays out the requirements for "secondary containment integrity." Any violation of any rules must be reported to the NRC; the NRC responds by issuing enforcement penalties against the offending facility.

The Supreme Court has recognized the critical role of this federal safety system for nuclear power plants: "The Commission's prime area of concern in the licensing context ... is national security, public health, and safety." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519, 550, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1978) (citing 42 U.S.C. §§ 2132, 2133, 2201). The "regulatory scheme ... is 'virtually unique in the degree to which broad responsibility is reposed in the [NRC]....'" *Carstens v. NRC,* 742 F.2d 1546, 1551 (D.C.Cir.1984) (quoting *Siegel v. AEC,* 400 F.2d 778, 783 (D.C.Cir.1968)), *cert. denied,* 471 U.S. 1136, 105 S.Ct. 2675, 86 L.Ed.2d 694 (1985). Nothing could be plainer than the public interest in the safe operation of nuclear power plants that underlies this panoply of federal regulations.

In the case at hand, when the NRC was notified of Schott's violation of Technical Specification Section 3.7.c.1, it issued an inspection report that approved the Company's discharge of Schott and included a written reprimand to the Company for compromising secondary containment. Therefore, it is clear that when Schott breached the technical plant specification—required by the NRC, as mandated by Congress—he violated more than a simple in-house procedure. Instead, he broke a safety rule that was put in place pursuant to a strict regulatory scheme devised by Congress for the protection of the public from the hazards of nuclear radiation.

Our decision today is in keeping with the line of cases vacating arbitrators' awards that direct the reinstatement of employees whose deliberate acts have jeopardized public health or safety. Courts have rejected awards that have ruled in favor of an operator of dangerous equipment who possesses drugs, *S.D. Warren Co. v. United Paperworkers' Int'l Union, Local 1069,* 815 F.2d 178 (1st Cir.1987), and an alcohol-drinking truck driver, *Amalgamated Meat Cutters, Local Union 540 v. Great Western Food Co.,* 712 F.2d 122 (5th Cir.1983). Similarly, an arbitrator's award that allowed the employer at a meat packing plant to forbid his employees from reporting sanitation violations directly to the government was vacated because it threatened the public health. *Local No. P–1236, Amalgamated Meat Cutters v. Jones Dairy Farm,* 680 F.2d 1142, (7th Cir.1982). *But see Amalgamated Transit Union, AFL–CIO Local Div. 1309 v. Aztec Bus Lines,* 654 F.2d 642 (9th Cir.1981) (award

a court may refuse to enforce an award on public policy grounds only when the award itself violates a statute, regulation, or other manifestation of positive law, or compels conduct by the employer that would violate such a law." —— U.S. ——, n. 12, 108 S.Ct. 374, n. 12. In *Muschany,* the Supreme Court based the public policy exception on "definite indications in the law of the sovereignty," 324 U.S. at 66, 65 S.Ct. at 451—not just on "definite laws," as Schott's Union argues. An arbitrator may be overruled "when the award, although not re-

quiring illegal conduct, is said to be inconsistent with some significant public policy." R. Gorman, *Labor Law—Unionization and Collective Bargaining* 597 (1982). *See DuPont,* 790 F.2d at 616; *United States Postal Serv. v. American Postal Workers Union,* 736 F.2d 822, 824 (1st Cir. 1984). *But see, e.g., American Postal Workers Union v. United States Postal Serv.,* 789 F.2d 1, 8 (D.C.Cir.1986) (award reinstating employee who admitted to mishandling mail upheld because it did not violate established law or seek to compel unlawful action).

reinstating driver who knowingly drove bus with bad brakes upheld over public policy objections).

On the other hand, labor awards directing the reinstatement of employees whose acts posed no danger to public health or safety are usually upheld. For instance, in *Local 453, Int'l Union of Elec. Workers v. Otis Elevator Co.*, 314 F.2d 25 (2d Cir.), *cert. denied*, 373 U.S. 949, 83 S.Ct. 1680, 10 L.Ed.2d 705 (1963), the court dismissed public policy arguments by the employer and enforced the arbitrator's award reinstating an employee convicted of gambling at work. The worker's conduct may have threatened morality, but not safety. Although the Union calls *Otis* the "leading Circuit Court case" supporting Schott's reinstatement, Appellant's Brief at 9, the two sets of facts have little in common: gambling at work may well be a breach of the employee's duty to his employer, but it is hardly analogous to gambling with the public well-being by flouting a safety rule in a nuclear power plant. *See also American Postal Workers Union v. United States Postal Serv.*, 789 F.2d 1, 8–9 (D.C.Cir.1986) (public policy against dishonest mailmen insufficient to vacate award); *Daniel*, 738 F.2d at 300–01 (public policy favoring no-strike clauses insufficient to vacate award). *But see United States Postal Serv. v. American Postal Workers Union*, 736 F.2d 822, 825 (1st Cir.1984) (arbitrator's reinstatement of embezzling mailman vacated on public policy grounds, although public health or safety not threatened).

Appellant relies on *Northwest Airlines v. Airline Pilots Ass'n*, 808 F.2d 76 (D.C. Cir.), *petition for cert. filed*, (U.S. March 26, 1987), in which the court upheld an arbitrator's award reinstating a pilot who admitted to flying a passenger jet while intoxicated. Regardless of the outcome of *Northwest Airlines* should the Supreme Court grant certiorari, that case is distinguishable from the present case because the arbitrator's award was based on the pilot's recertification by the Federal Avia-

tion Administration (FAA) after a two-year rehabilitation program. The court declared that "second-guess[ing] the present judgment of the FAA" would be "the height of judicial chutzpah." *Id.* at 83. In the present case, however, the NRC endorsed Schott's termination.

The fact that Schott's violation of secondary containment did not result in any actual injury to public health or safety is of no consequence. His willful actions could have caused a disaster. In the words of the District Court, "He is no longer to be trusted to work in such a critical environment when he shows no respect for the safety implications of his actions and when he is willing to jeopardize the safety of the public...." *Iowa Elec. Light & Power Co. v. Local Union 204 of the Int'l Bhd. of Elec. Workers*, Nos. C 85–0135 & –0137, slip op. at 18 (N.D.Iowa March 11, 1987). "Aside from any considerations bearing directly on [the discharged employee], we cannot avoid the common sense implications that requiring the rehiring of [the violator] would have on other ... employees and on the public in general." *Postal Serv.*, 736 F.2d at 825. We agree with those observations.

Our holding today should not be read as a blanket justification for the discharge of every employee who breaches a public safety regulation at a nuclear power plant.[4] There may be circumstances under which a violation might be excused. But in this case, Schott's violation of the safety rule was serious. Nor, as the Union contends, was it an unknowing violation. Schott had attended several courses discussing secondary containment, passed the examinations, and even offered favorable critiques of the teachers and materials. He knew the safety rule. Although the arbitrator found that there was some "uncertainty" among employees as to the boundaries of secondary containment and quoted one supervisor's comment that training was inadequate, Arbitration Decision at 7, Schott's call to the control room for permission to defuse the system demonstrates

---

4. We agree with Judge Heaney's concurrence, *post* at 1430, that a company may not be able fully to meet its regulatory requirements merely by firing an employee who violates a safety rule.

that he knew the interlock was important. After being denied permission, he deliberately proceeded to defeat the interlock system, thereby committing a knowing violation of the safety rule—for no better reason than that he wanted to get an early start on lunch. While the cast on Schott's leg may have been a reason for him to beat the noon rush, it did not justify defeating the safety system to do so. Furthermore, the arbitrator's finding that it was "fairly common ... to encounter problems in the interlock system," *id.* at 6, does not excuse Schott's conduct when he knew the mechanism was functioning properly.

In these circumstances, we agree with the District Court that the unmistakable public policy favoring the strict observance of federally-mandated safety regulations at nuclear power plants requires that the arbitrator's award ordering Schott's reinstatement be vacated.

The decision of the District Court is affirmed.

HEANEY, Circuit Judge, concurring.

I am in general agreement with the panel opinion. It is important that we strongly support a public policy of strict compliance with safety regulations at nuclear facilities. It troubles me, however, that we may be sending a message to the nuclear power industry that a company can satisfy the regulatory authorities by discharging an employee who has violated a safety regulation, even though the company itself may be guilty of safety violations. Indeed, this appears to be the case here. The arbitrator's factual findings were essentially as follows:

1. The Grievant was not that aware that his improper conduct was as serious or grave a matter as that claimed by the Company. He thought the integrity of the *secondary containment system,* was still secure by the locked doors to the outside on the opposite side of the machine shop. It was a fairly common experience to encounter the problem of the locked machine shop door accompanied by problems in the interlock system.

2. Upon Grievant's exit from the Machine Shop, and in the presence of other employees and supervisors in the area, none of the supervisors made any note or observation that the *secondary containment security* had been breached. One supervisor even asked Grievant to return to the Machine Shop and get a tape measure. None of the supervisors expressed any warning or criticisms to Grievant that an infraction or disciplinary matter had occurred at the time.

3. Among the supervisors, and the control room engineer, himself, there was uncertainty as to where the *secondary containment* boundaries did lie and whether they included the Machine Shop because of its locked doors to the outside on its opposite side.

4. Shortly after the incident and returning to the scene, several supervisors themselves caused both doors to be open and a break of the interlock in their experiment and searched to determine if there were any malfunctions. A malfunction was discovered in the set of doors between the railroad truck area and the reactor building. This conduct itself suggests that the brief interval of both doors opens [sic] in the enclosed area was not as grave or serious a matter or breach of the secondary containment boundary as such, at least in the minds of those involved at the time.

5. There had been frequent problems with the locked Machine Shop door, and the interlock system, not only malfunctions, but where inner door 239 A had been inadvertently left loose or blown open. Either way, there were times when (Grievant) shouldn't have been locked in, and there were other times when they shouldn't have been able to get out if the system had been functioning more properly. There is no evidence that these other numerous problem occasions were noted as infractions or breaches of the secondary containment system as such.

6. The greater persuasion looms in the argument of the Union, that the various training sessions offered by the Company and reminders to employees to follow

strict standards and procedures, did not address the door problem or incident experience of the Grievant that specifically, and that the Grievant really did not have the knowledge of the supposed gravity of the situation as claimed by the Company. Companion to this concept is the remark by supervisor Clausen during the investigation, intimating something less than discharge, since the employees have not had sufficient training in the interlock system.

Notwithstanding these findings, all of which are fully supported in the record, and all of which point to supervisory failures at least as serious as those of Don Schott, there is no evidence in the record that any supervisor was suspended or discharged by top management or that the company was fined for its failures by the Nuclear Regulatory Commission.

The failure of top management and the Nuclear Regulatory Commission to act poses a greater danger to employees and public safety than does the isolated act of Schott.