# Illinois Official Reports

## Appellate Court

---

**Illinois State Toll Highway Authority v.**
**International Brotherhood of Teamsters, Local 700,**
**2015 IL App (2d) 141060**

---

| | |
|---|---|
| Appellate Court Caption | THE ILLINOIS STATE TOLL HIGHWAY AUTHORITY, Plaintiff-Appellee, v. INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL 700, Defendant-Appellant. |
| District & No. | Second District <br> Docket No. 2-14-1060 |
| Filed | November 17, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 14-CH-651; the Hon. Terence M. Sheen, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Nicole L. Chaney, of Teamsters Local 700, of Park Ridge, for appellant. <br><br> Lisa Madigan, Attorney General, of Chicago (Carolyn E. Shapiro, Solicitor General, and Christina T. Hansen, Assistant Attorney General, of counsel), for appellee. |

Panel                    JUSTICE BURKE delivered the judgment of the court, with opinion.
                         Presiding Justice Schostok and Justice Hutchinson concurred in the
                         judgment and opinion.


**OPINION**

Defendant, the International Brotherhood of Teamsters, Local 700 (Union), appeals a judgment vacating an arbitrator's award in its favor and against plaintiff, the Illinois State Toll Highway Authority (Tollway). We reverse, and we reinstate the award.

The Union filed a grievance against the Tollway. According to the arbitrator's written decision, the Tollway "requir[es] that an employee, who is absent due to illness for two or fewer days, present medical documentation, or other proof acceptable to the Tollway, certifying the employee's ability to return to work, and explaining the reasons for the absence." The Union contended that this policy violates the parties' Collective Bargaining Agreement (CBA).[1]

As pertinent here, the CBA reads:

"ARTICLE I

Purpose

1.1 It is the intent and purpose of the parties to set forth in this Agreement the terms of employment concerning rates of pay, hours of employment, and other working conditions to be observed by them and the employees covered hereby.

* * *

ARTICLE III

Management Rights

3.1 The management of the operations of the Employer, the determination of its policies, budget and operations, the manner of exercise of its statutory functions, and the direction of its working forces, including, but not limited to, the right to hire, promote, demote, transfer, classify and reclassify, assign and direct employees; to discipline, suspend, and discharge for cause; to relieve employees from duty because of lack of work or other legitimate reasons; to make and enforce reasonable rules of conduct and regulation; to implement a substance abuse program, to determine the departments, divisions and sections and work to be performed therein; to determine quality; to determine the number of hours of work and shifts per work week; to establish and change work schedules and assignments; to introduce new methods of operation; to eliminate, relocate, transfer, or subcontract work and to maintain efficiency is vested exclusively in the Employer provided, however, that no such management right shall be exercised in a manner contrary to or inconsistent with the provisions of this Agreement. The exercise of these rights shall be subject to the grievance procedure set forth in Article XII.

---

[1]The record contains no further evidence of the grievance. There is no dispute, however, that the arbitrator's summary of the grievance is accurate.

\* \* \*

## ARTICLE XI
### Miscellaneous Rights and Benefits

\*\*\*

11.2(A) SICK LEAVE. A full-time employee shall accumulate sick leave at the rate of one (1) day for each month of full-time service. Except as hereinafter provided, sick leave days shall be used only for reason of bona fide illness, accident or injury of the employee. Unused sick leave may be carried forward without limitation. Sick leave benefits as provided above shall be payable with the first (1st) day of absence. If an employee is absent due to illness for more than two (2) days, he/she must present medical documentation or other proof acceptable to the Employer, certifying his/her ability to return to work and explaining the reasons for the absence.

\* \* \*

## ARTICLE XII
### Grievance and Arbitration Procedure

12.1 GRIEVENCE STEPS. In order to provide an orderly method of handling and disposing of all disputes, misunderstandings, differences, or grievances arising between the Employer and the Union or the employees covered by this Agreement as to the meaning, interpretation, and application of the provisions of this Agreement, such differences shall be settled in the following manner, except as herein otherwise provided. In the event the Employer re-organizes or changes otherwise its grievance representatives listed below, it agrees to timely notify the Union of said changes and such notice shall serve solely as a procedural modification of this Article.

STEP 1: An aggrieved employee and steward, if requested by the employee, shall first orally take up the grievance with the employee's immediate Section Manager and District Manager. The District Manager and Section Manager shall orally reply to the grievance within three (3) work days.

STEP 2: If the grievance is not satisfactorily adjusted in Step 1 or an answer is not given within the time specified, the grievance shall be reduced to writing on a standard grievance form, signed by the employee involved and the steward, dated and presented in duplicate:

(A) In the case of an Engineering Department employee, to the General Manager of Maintenance and Traffic.

(B) In the case of an Operational Services employee, to the Chief of Operational Services.

The written grievance shall contain a brief statement of the nature of the grievance, shall identify the section or sections of the Agreement allegedly violated and shall state the relief sought. Within seven (7) calendar days of receipt of the written grievance, the representative of the Employer named above shall make arrangements with the designated representative of the Union for a meeting to discuss the grievance. In addition to the designated representative of the Union and the representative of the Employer named above, those attending the meeting shall include, if requested by either party, the Supervisor of the grievant, the grievant, the

Union Steward and employee witnesses. Within seven (7) calendar days after the meeting, the representative of the Employer named above shall note his disposition of the grievance thereon, sign, date and return one (1) copy of the grievance to the designated representative of the Union.

STEP 3: If, in the case of Engineering Department employees, the matter is not satisfactorily adjusted in Step 2 within the time specified, the designated representative of the Union shall within seven (7) calendar days request a meeting with the Chief Engineer. Within seven (7) calendar days after such meeting, the Chief Engineer shall note his disposition on the grievance form, sign, date and return one (1) copy thereof to the designated representative of the Union.

If, in the case of the Operational Services employees, the matter is not satisfactorily adjusted in Step 2 within the time specified, the designated representative of the Union shall within seven (7) calendar days request a meeting with the Chief of Operational Services. Within seven (7) calendar days of such meeting, the Chief of Operational Services shall note his disposition on the grievance form, sign, date and return one (1) copy thereof to the designated representative of the Union.

STEP 4: If the grievance is not satisfactorily adjusted in Step 3 or an answer is not given within the time specified, the Union may at its election submit the grievance within thirty (30) calendar days from the date of the Employer's written denial of the grievance or the date an answer was due to arbitration in accordance with the following procedure.

The Union and the Employer shall jointly request the Federal Mediation and Conciliation Service for a list of names of seven (7) arbitrators, all of whom are members of the National Academy of Arbitrators. From the list, the Union shall strike three (3) names, then the Employer shall strike three (3) names, and the person whose name remains shall be the arbitrator.

The arbitrator will be jointly contacted and asked to hold a hearing at which both parties may present evidence. The Arbitrator [*sic*] shall decide only the grievance submitted by applying only the express language of this Agreement, and shall have no authority to add to, subtract from, modify, or amend this agreement [*sic*].

The arbitrator's duly rendered decision shall be final and binding on the Employer, the Union, and the employee or employees involved. \*\*\*

12.2 TIME LIMITS. Grievances must be presented in Step 1 [*sic*] within ten (10) working days from the occurrence of the incident or the time the employee should have obtained direct knowledge of the condition which gave rise to the grievance. Appeals from one step to the next must be taken within five (5) working days from [the] date of answer or time specified for answer."

¶ 4    On December 13, 2013, at an arbitration hearing, both parties presented witnesses and introduced evidence. (The record contains no report of this hearing.) On January 8, 2014, the arbitrator issued his written ruling.

¶ 5    The arbitrator noted that the Tollway requires any employee who is absent due to illness for two days or fewer to present medical documentation, or other acceptable proof, certifying the employee's ability to return to work and explaining the absence. The Union contended

- 4 -

that this policy violates the CBA. The issues were (1) whether the Union's grievance was arbitrable; and (2) if so, whether it was meritorious.

¶ 6    The arbitrator then recited the following undisputed facts. The Tollway has a legitimate interest in deterring the use of sick days for improper purposes. It has given its supervisors, known as "garage managers," the authority to require certain employees to provide a doctor's excuse or other proof of illness before they are permitted to return to work. However, a garage manager has the discretion to decide when to require documentation. The Tollway admitted that it had required some employees who took sick leaves of two days or fewer to present documentation that they were able to return to work and explaining their absences. At least one such employee was told by his foreman that, if he did not provide the documentation, the foreman would "write him up" for insubordination. The Union filed a grievance contending that "[the] medical-documentation requirement as applied by [the Tollway]" violated article XI, section 2(A), of the CBA. The grievance was not filed by or in the name of a specific employee.

¶ 7    The arbitrator first addressed whether the grievance was subject to arbitration. He noted, "The Tollway says there is nothing for me to decide," because the grievance did not mention a specific aggrieved employee or allege a specific date and time when an employee was required to present documentation. The arbitrator disagreed, noting that article XII, section 1, of the CBA states that arbitration shall "provide an orderly method of handling and disposing of all disputes, misunderstandings, differences, or grievances arising between the Employer and the Union or the employees covered by this Agreement as to the meaning, interpretation, and application of the provisions of this Agreement." This language was not limited to disputes between the Tollway and specific employees, but extended to those between "the Employer and the Union." Although the award that the Union sought might be considered a form of declaratory relief, and a permanent injunction against enforcing the Tollway's policy, the CBA enables the arbitrator to provide such relief.

¶ 8    The arbitrator then turned to the merits of the grievance. He stated as follows:

"Article XI, Section 11.2(A) is plainly written. If an employee is absent due to illness for more than two days, then that employee must present medical documentation or other proof acceptable to the Tollway certifying the ability to return to work and explaining the reasons for the absence. The Tollway reading that language tells me it means that the Tollway also has the discretion to require medical documentation for illness absences of two days or fewer. Why is that? Very simple, says the Tollway. The [CBA] doesn't say the Tollway can't ask for documentation if the absence is for two days or fewer.

Is that what the [CBA] says? Does that make sense? It would make perfect sense if there was no two-day grace period in the [CBA], and if the [CBA] said, 'If an employee is absent due to illness, he/she must present medical documentation or other proof acceptable to the Employer, certifying his/her ability to return to work and explaining the reasons for the absence.' What the Tollway is asking me to do is, by arbitration award, delete the two-day grace period from the [CBA]."

¶ 9    The arbitrator noted the Tollway's argument for why the parties had not intended to establish an automatic two-day grace period. Previously, the Tollway contended, there had been a "sick-leave bank" that encouraged employees not to take medical leave without good cause; the less they took, the more they accumulated in the long run. However, the CBA had

eliminated the sick-leave bank, and now, without any documentation requirement, employees could " 'game the system' " by taking sick leave for one or two days without being sick, with no way for the Tollway to stop them. The arbitrator granted that article XI, section 11.2(A), might allow "abuse of the sick-day benefit." Cheating was possible, but, he explained, "even a doctor's excuse is not a magic elixir to prevent dishonesty. You can actually buy fake doctor's illness excuses online. In the end, I simply do not have the authority to rewrite the [CBA] to make it easier to catch the cheater." Moreover, the Tollway was not left without recourse; it can discipline an employee for just cause, and "there are available investigative methods to catch the cheater." In any event, had the parties intended to give the Tollway the discretion to require medical documentation for any sick-leave absence, "they should have said what they meant."

¶ 10    The arbitrator held that, for absences of two days or fewer, the Tollway may not require documentation certifying that an employee is able to return to work and explaining the absence.

¶ 11    The Tollway applied under the Uniform Arbitration Act (Act) (710 ILCS 5/1 *et seq.* (West 2012)) for judicial review. The application raised three arguments: (1) the arbitrator erred in finding that the grievance was subject to arbitration; (2) the arbitrator exceeded his authority by revising the CBA; and (3) the arbitrator's construction of the CBA violated public policy. On the first issue, the Tollway asserted that the CBA limited arbitration to a grievance brought by "an actual aggrieved employee," as implied by article XII, section 1 referencing, in Step 1, "[a]n aggrieved employee" and article XII, section 2 requiring that a grievance be presented "within ten (10) working days from the occurrence of the incident to the time *the employee* should have obtained direct knowledge of the condition which gave rise to the grievance." (Emphasis added.) The Tollway reasoned that, because the Union had not brought the grievance on behalf of a specific employee, the arbitrator could not decide it.

¶ 12    On the second issue, the Tollway argued that article III, section 1, authorizes it to make and enforce reasonable rules of conduct that are not inconsistent with the CBA. Giving management the discretion to require documentation for absences of two days or fewer is such a rule. Article XI, section 2(A), does not prohibit this rule; it merely states that, for an absence of *more* than two days, an employee must present documentation. Thus, the Tollway argued, in prohibiting any requirement of documentation for shorter absences, the arbitrator had not interpreted the CBA but had amended it.

¶ 13    Finally, on the third issue, the Tollway argued that the arbitrator's construction of the CBA violated public policy by prohibiting the Tollway from enforcing federal and state laws relating to motor-vehicle safety, in particular those laws that prohibit a person from operating a vehicle if he or she is taking certain medicine(s) unless a physician certifies that the person is able to do so without impairment. The Tollway reasoned that the flat ban on requiring documentation for short absences impeded its ability to enforce those laws.

¶ 14    The Union responded as follows. First, the dispute was subject to arbitration even without a specific incident or a specific aggrieved employee. Second, the arbitrator had based his decision on the pertinent language of the CBA, not on extraneous matters, and the court could not replace his interpretation of the CBA with its own. Finally, the Tollway had not shown that the arbitrator's decision violated an explicit, well-defined, and dominant public policy. According to the Union, although safe driving is an important public interest, the documentation policy for short absences was not based on any concern that an employee

might be "unsafe for the road." Instead, it gave garage managers "unfettered discretion" to require documentation.

¶ 15     The court ordered briefing. Although the Tollway filed a brief, it is not in the record on appeal. The Union filed a brief and an amended brief, which are in the record.

¶ 16     On September 30, 2014, the trial court issued its judgment. The court agreed with the Union that the dispute was subject to arbitration, but it agreed with the Tollway on the merits. On arbitrability, the court noted that article XII, section 1, states that it governs "*all* disputes, misunderstandings, differences, or grievances arising between the Employer *and the Union or the employees* covered by this Agreement." (Emphases added.) However, although this section specifies a process for an employee to follow in order to bring a dispute to arbitration, it does not specify any such process for the Union to bring a grievance to arbitration. Thus, there was a conflict. The court concluded that the arbitrator had resolved this conflict reasonably.

¶ 17     Turning to the merits, the court held that the arbitrator had exceeded his authority in finding that the CBA barred the Tollway from giving its supervisors any discretion to require employees to document sick-leave absences of two days or fewer. The arbitrator had not interpreted the CBA but had added "a blanket prohibition" that "redefined the rights of the parties." The court recognized that it could not substitute its construction of the CBA for the arbitrator's honest judgment (see *United Paperworkers International Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987)), which must stand if it was clearly drawn from the essence of the CBA (see *American Federation of State, County & Municipal Employees v. Department of Central Management Services*, 173 Ill. 2d 299, 306 (1996) (*AFSCME II*)). Nonetheless, the court stated, although the CBA did not expressly require documenting sick-leave absences of two days or fewer, it did not follow that "the parties gave up all managerial discretion not expressly provided for therein; it could mean the parties intended to leave those decisions up to their own discretion or the parties did not see a need to expressly provide for those situations."

¶ 18     The court qualified its holding: "[T]he spirit of the Arbitrator's ruling must be upheld. The Tollway may only require doctor's notes for absence of two days or less upon good cause shown, not to facilitate a witch hunt against employees whom it believes are using sick days in violation of the sick day policy." The court invalidated only the arbitrator's "*blanket* prohibition against asking for doctor's notes after employee absences of two days or less, because the addition of language to the CBA exceeded his scope of authority." (Emphasis in original.)

¶ 19     Finally, the court held, the arbitrator's construction of the CBA violated "a strong public policy in Illinois to keep roadways safe and ensure [that] unsafe motorists are not operating vehicles in ways [by which] they could injure themselves or others." This was because at times "it may be necessary for the Tollway to seek a doctor's note from an employee before permitting them to return to work on the Illinois roadways."

¶ 20     The court vacated the "blanket prohibition portion of the Award." The Union appealed.

¶ 21     On appeal, the Union contends that the trial court erred by (1) substituting its construction of the CBA for that of the arbitrator; and (2) holding that the arbitrator's construction of the CBA violated public policy. The Tollway disagrees with both contentions, and it also asserts that the court and the arbitrator erred in holding that the Union's grievance was arbitrable. We address the Tollway's contention first; if the arbitrator

should not have considered the grievance at all, the award cannot stand, regardless of the merits.

¶ 22     The Union contends that the Tollway forfeited its arbitrability argument by failing to raise it until "the day of the arbitration–and at no point prior during the grievance procedure." The portion of the record to which the Union cites does not support this premise; it includes only the arbitrator's statement that the Tollway had raised the arbitrability issue at some point. Moreover, the Union cites no legal authority to support its argument. For this reason, we deem the argument forfeited. See *Gandy v. Kimbrough*, 406 Ill. App. 3d 867, 875 (2010) (arguments unsupported by proper citations to the record and pertinent authority are forfeited).

¶ 23     The Union's argument is forfeited for a second reason. In the trial court, the Union responded on the merits to the Tollway's argument that the grievance was not arbitrable; it did not claim that the Tollway had forfeited the issue. Indeed, the Union's response stated, "The Tollway and Union jointly presented issues to the arbitrator, namely, 'Is the Union's Grievance arbitrable?' " The Union raises its forfeiture argument belatedly. Thus, it has forfeited its forfeiture argument. See *People ex rel. Foreman v. Village of Round Lake Park*, 171 Ill. App. 3d 443, 449 (1988). We also note that the arbitrator did not find the arbitrability issue forfeited; he decided it on the merits.

¶ 24     Turning to those merits, we note that, when it is unclear whether the subject matter of a dispute falls within an arbitration agreement, the question should initially be decided by the arbitrator. *City of Naperville v. Illinois Fraternal Order of Police*, 2013 IL App (2d) 121071, ¶ 15. However, the trial court's review of the arbitrator's decision is *de novo*, and our review of the trial court's ruling is also *de novo*.[2] *Id.* "[T]he parties to an agreement are bound to arbitrate only those issues [that] they have agreed to arbitrate, as shown by the clear language of the agreement and their intentions expressed in that language." *Id.* ¶ 14. Nonetheless, "[d]oubts regarding the scope of arbitrable issues ought to be resolved in favor of arbitration." *Heiden v. Galva Foundry Co.*, 223 Ill. App. 3d 163, 168 (1991).

¶ 25     If the "boilerplate" in the case law seems less than wholly consistent, the same may be said of the CBA's provisions on arbitrability. On the one hand, the Tollway is correct that the specific procedures spelled out in article XII, including arbitration, do appear to presuppose that, as Step 1 reads, "[a]n aggrieved employee" is the one filing a grievance. Article XII, section 2, sets the time limit for presenting a grievance at 10 working days "from the occurrence of the incident or the time the employee should have obtained direct knowledge of the condition which gave rise to the grievance." It appears to presuppose that a grievance must be filed by a particular employee or be based on a specific incident–or perhaps both.

¶ 26     On the other hand, the Union is correct that article XII, section 1, states broadly that the procedure spelled out in the rest of article XII, including arbitration, shall be used to handle and dispose of "all disputes, misunderstandings, differences, or grievances arising between

_____

[2]The trial court apparently approached the arbitrator's finding under the assumption that the limited judicial review that the Act provides for arbitrators' decisions on the merits also applies to arbitrators' findings on arbitrability. This error is of no consequence here, as in essence we review *de novo* the arbitrator's decision on arbitrability and, in any event, we review the trial court's judgment and not the reasoning that it provided in support of that judgment.

the Employer and the Union or the Employees covered by this Agreement as to the meaning, interpretation, and application of the provisions of this Agreement." This phraseology implies that article XII's procedure applies to the grievance here, despite the absence of a specific employee as grievant or a specific incident as the basis of the grievance.

¶ 27    The use of the categorical "all" is followed not merely by "grievance," which is customarily used in relation to a specific incident involving a specific employee, but also "disputes," "misunderstandings," and "differences," words that do not imply the existence of a specific grievant or the limitation of relief to past wrongs. Although this multiplicity might be explained by an abundance of caution–or just traditional lawyerly redundancy–the remainder of the quoted language is more telling. The "disputes, misunderstandings, differences or grievances" that are subject to arbitration are those "between the Employer and *the Union or the Employees* covered by this Agreement." (Emphasis added.) This phraseology implies that arbitration applies to *any* CBA-based dispute between the Tollway *and the Union*, as well as any such dispute between the Tollway and one or more specific employees. Moreover, the use of the phrase "*meaning, interpretation*, and application" (emphasis added) suggests the availability of declaratory relief that does not depend on the existence of a dispute over the past application of the CBA to a specified employee.

¶ 28    We acknowledge that the matter is not as clear-cut as a court would wish, but we resolve any doubts in favor of arbitrability. We also note that the grievance here did not raise a purely abstract question; the parties agreed that at least one employee had been subjected coercively to the documentation requirement that the Tollway had allowed supervisors to impose at their discretion. Further, the phraseology of Step 1 and article XII, section 2, might have been chosen because, in the great majority of cases, a grievance *is* filed by a specified employee (or specified employees) and *is* based on a specified past injury. We cannot say that this choice of language implies that those scenarios were intended as the only ones that would be arbitrable.

¶ 29    Having resolved arbitrability in favor of the arbitrator's decision, we turn to the merits of his ruling. The Union contends first that the trial court erred in vacating (or modifying) the arbitrator's interpretation of the CBA as applied to the authority of supervisors to require documentation for sick-leave absences of two days or fewer. The Union argues that the court exceeded its limited review powers and improperly substituted its construction of the CBA for that of the arbitrator. For the reasons that follow, we agree.

¶ 30    Judicial review of an arbitrator's award is "extremely limited." *AFSCME II*, 173 Ill. 2d at 304. A court may disturb an award only in the event of fraud, corruption, partiality, misconduct, mistake, or the failure to submit the question to arbitration. *Id.*; see 710 ILCS 5/12(a) (West 2012). Because the parties bargained to have the meaning of the CBA settled by the arbitrator, not by a judge, we may not disturb the arbitrator's interpretation of the parties' contract merely because we have a different interpretation. *AFSCME II*, 173 Ill. 2d at 305. Rather, we must enforce the award if the arbitrator acted within the scope of his authority and the award drew its essence from the agreement. *Id.* at 304-05. Thus, we may not disturb the arbitrator's award unless he based it on a body of thought, feeling, policy, or law outside of the contract. *Village of Posen, Illinois v. Illinois Fraternal Order of Police Labor Council*, 2014 IL App (1st) 133329, ¶ 37.

¶ 31    Although the arbitrator's interpretation of the CBA, and, in particular, article XI, section 2(A), is surely open to debate, we cannot say that he based it on something outside the

parties' contract. The pertinent portion of the award that we quoted at length, even if dubious as legal logic, is a good-faith reading of a legal document, based on principles of construction aimed at ascertaining the intent of the parties who drafted and agreed to it.

¶ 32     The arbitrator noted that article XI, section 2(A), explicitly requires employees to supply medical documentation for sick-leave absences of more than two days but says nothing about any requirement for shorter such absences. The arbitrator then reasoned that this conscious omission implied that the parties had intended that there be no such requirement for shorter absences–*i.e.*, that there be a "two-day grace period." We note that, although article XI, section 2(A), does not explicitly create a "two-day grace period" for sick leave, neither does anything in the CBA explicitly rule out that possibility. The arbitrator appears to have relied on the maxim of construction *inclusio unius est exclusio alterius*–the inclusion of one thing implies the exclusion of another (see *In re Marriage of Hendry*, 409 Ill. App. 3d 1012, 1018 (2011)).

¶ 33     The arbitrator's inferences are not beyond dispute. But they are based on his construction of the CBA, not on a body of thought, feeling, policy, or law outside of it. One may certainly question whether the reasoning by negative implication is as conclusive as the arbitrator stated: perhaps the exclusion of any explicit documentation requirement for shorter sick-leave absences was intended to leave discretion with the Tollway to impose such a requirement later. The trial court reasoned that the omission of any requirement for documenting short absences "*could mean* the parties intended to leave those decisions up to their own discretion or the parties did not see a need to expressly provide for those situations." (Emphasis added.) But we may not overturn an arbitrator's construction of a collective bargaining agreement merely because it *could mean* something else.

¶ 34     However one resolves the issue, even a resolution adverse to that chosen by the arbitrator is no more than a conclusion that he made an error of contract construction. There is no basis to infer that extraneous, improper, or extracontractual factors entered into his decision.

¶ 35     The trial court held that, in his construction of the CBA, the arbitrator "exceeded his authority" by "adding" a term to the CBA instead of interpreting the CBA as written. But this really amounted to saying that the arbitrator erred in interpreting the CBA–that he made an error of law (or fact) that had the effect of adding a term. Were this all it took for courts to vacate arbitrators' constructions of collective bargaining agreements, there would be little if any distinction between our "extremely limited" (*AFSCME II*, 173 Ill. 2d at 304) review of arbitrators' decisions and our *de novo* review of the judicial construction of contracts. Any act of contractual interpretation that is erroneous can be said to have "changed the parties' contract" or even (in many instances) to have "added a term."

¶ 36     On this issue, we note finally that the trial court limited its ruling by specifying that the Tollway's right to require documentation for short sick-leave absences (or to authorize its supervisors to do so) applied only with "good cause shown, not to facilitate a witch hunt against employees whom it believes are using sick days in violation of the sick day policy." With all due respect, we believe that it was the court, and not the arbitrator, that added a term to the CBA. While the court's policy decision might well be commendable, it lacked the authority to rewrite the CBA–or even to interpret it in a way that it preferred to the arbitrator's way.

¶ 37     We hold that the trial court erred in vacating the arbitrator's construction of the CBA. We uphold the arbitrator's conclusion that the CBA prohibits the Tollway from imposing any

- 10 -

documentation requirement for sick-leave absences within the "grace period." We must decide the final issue: whether this construction of the CBA violates public policy and is thus invalid.

¶ 38 The trial court agreed with the Tollway that the CBA, as the arbitrator construed it, violates public policy. The court noted that, in deciding whether to vacate the award as against public policy, it had to ask (1) whether a well-defined and dominant public policy could be identified; and (2) if so, whether the arbitrator's award, as reflected in his interpretation of the agreement, violated that policy. Also, the court noted, to ascertain the existence of public policy, a court must look to the constitution, statutes, and relevant judicial opinions. See *Chicago Fire Fighters Union Local No. 2 v. City of Chicago*, 323 Ill. App. 3d 168, 176 (2001).

¶ 39 In holding that the arbitrator's award was against public policy, the court did not conclude that the "blanket prohibition" on requiring documentation for short sick-leave absences actually violated any constitution, statute, or judicial opinion. Indeed, the court's order did not cite any constitution, statute, or judicial opinion. Instead, it explained:

> "The Court finds [that] there is a strong public policy in Illinois to keep roadways safe and ensure [that] unsafe motorists are not operating vehicles in ways [by which] they could injure themselves or others. Further, and for the same reasons previously addressed, the Arbitrator's blanket prohibition precluding the Tollway from asking for a doctor's note for absences of two days or less highlights circumstances where it may be necessary for the Tollway to seek a doctor's note from an employee before permitting them to return to work on the Illinois roadways. Therefore, the Arbitrator's award violates public policy to the extent [that] a blanket prohibition *** prevents the Tollway from ensuring [that] its employees are fit for the operation of motor vehicles on Illinois roads."

¶ 40 Apparently, at the arbitration hearing, the Tollway never contended that a flat ban on requiring documentation for short sick-leave absences would violate public policy; otherwise, the arbitrator's ruling would have said so and discussed the issue. In its application to the trial court, the Tollway raised the issue in six short paragraphs. Paragraph 20 cited an appellate opinion for general principles. Paragraph 21 stated, in full, "The Arbitrator's Award, by creating a new contractual term, prohibits the Tollway from enforcing federal and state laws relating to motor safety." Paragraph 22 quoted the pertinent part of the arbitrator's award. Paragraph 23 stated, in full, "The Award does not allow for exception [*sic*] regardless of need or circumstances." Paragraph 24 stated, in full, "Federal and state law prohibits drivers of vehicles, especially those with CDL's [*sic*], from operating vehicles if they are taking certain medications unless, in certain circumstances, certified [*sic*] by a physician that they are able to perform their duties without impairment." A final, unnumbered paragraph read, in full, "By creating a new contractual provision that does not allow the Tollway to enforce federal and state laws as to the ability of employees to perform their duties without impairment, the Award is in violation of public policy." The application did not cite, quote, or attach copies of any federal or state laws.

¶ 41 Although we cannot say exactly what the Tollway's trial brief contained, the Union's response briefs imply that the Tollway cited regulations (not specified by the Union) contained in the Code of Federal Regulations (CFR). According to the Union's initial

- 11 -

response brief, the Tollway's brief argued that the arbitrator's award prevented it from complying with the CFR.

¶ 42 The Union argued that the Tollway had introduced no evidence of a nexus between safe driving and the Tollway's wholly discretionary policy. Also, the Union asserted, the Tollway had other means to ensure their employees' fitness to drive, such as discipline for just cause.

¶ 43 With the foregoing clarifications in mind, we turn to the trial court's ruling that the CBA as the arbitrator construed it violates public policy. As the issue is one of law, our review is *de novo*. See *AFSCME II*, 173 Ill. 2d at 318.

¶ 44 As with any contract, a court will not enforce a collective bargaining agreement that is repugnant to established norms of public policy. *Id.* at 307. However, successfully invoking the doctrine requires more than "speculation or assumption." *Misco*, 484 U.S. at 44. The party seeking to do so must clearly show that the agreement, as interpreted by the arbitrator, contravenes a " 'well-defined and dominant' " policy that is ascertainable " 'by reference to the laws and legal precedents and not from generalized considerations of supposed public interests.' " *AFSCME II*, 173 Ill. 2d at 307 (quoting *W.R. Grace & Co. v. Local Union 759,* 461 U.S. 757, 766 (1983)).

¶ 45 The trial court did not hold, and the Tollway does not now contend, that the CBA as the arbitrator construed it actually violates any law or legal precedent. Instead, in agreeing with the Tollway, the court reasoned that (1) there is a strong public policy in favor of promoting safe driving; and (2) the CBA, as construed, will tend to undermine this policy, because at times "it may be necessary for the Tollway to seek a doctor's note from an employee before permitting them to return to work on the Illinois roadways." We note that, in the trial court, the Tollway apparently supported the first premise by citing federal regulations that do not appear anywhere in the record on appeal. The court did not cite these regulations or any other specific laws but took judicial notice that there are federal and state laws that prohibit driving under various circumstances that regulatory agencies and legislatures have deemed unsafe.

¶ 46 On appeal, the Tollway cites some specific laws and judicial opinions to support the proposition that preventing ill and fatigued drivers from operating vehicles on the public roads is a well-defined and dominant public policy. These include a federal regulation, which has been codified in Illinois law (see 625 ILCS 5/18b-105 (West 2012)), reading: "No driver shall operate a commercial motor vehicle, and a motor carrier shall not require or permit a driver to operate a commercial motor vehicle, while the driver's ability or alertness is so impaired, or so likely to become impaired, through fatigue, illness, or any other cause, as to make it unsafe for him/her to begin or continue to operate the commercial motor vehicle." 49 C.F.R. § 392.3 (2011).

¶ 47 The Tollway also cites several judicial opinions noting that federal regulations and Illinois law prohibit drinking alcohol within specified times before driving and driving under the influence of alcohol. The exact pertinence of these laws and opinions to the requirement for medical clearance after sick leave is not clear; apparently, the Tollway cites them for the general proposition that safe driving is a recognized concern of public policymakers and that allowing people to drive while intoxicated is analogous to allowing them to drive while ill. The Tollway concludes that the arbitrator's award interfered with this policy by limiting its ability to prevent employees from driving while medically unsuited to do so. We presume that this is the reasoning that the Tollway used in the trial court and that the court adopted in its terse ruling.

¶ 48　　In the trial court, the Union responded to this reasoning in several ways, which it reiterates in its appeal. First, the Union argues, although there is a public interest in safe driving, there is no well-defined public policy supporting "an employer's unfettered discretion to demand medical documentation certifying an employee's ability to work and explaining the reasons for her absence." The Union adds that there is a "countervailing policy interest" in preserving "an employee's right to and expectation of privacy with respect to medical documentation."

¶ 49　　Second, the Union argues, even assuming the existence of a well-defined public policy, the Tollway did not identify a "nexus" between its documentation rule and the arbitrator's award. The Union notes that the award prohibited the Tollway from requiring an employee absent for two days or fewer to document both his ability to return to work and the reason for his absence. According to the Union, the arbitrator's construction of the CBA does not bar the Tollway from evaluating an employee's fitness to return to work and physical ability to do his duties safely. Further, the Union notes, the award did not refer to the Tollway's purported concern with safety, which apparently played no role in the arbitration hearing; instead, the award shows that the Tollway was concerned solely with combating the use of sick leave for nonmedical purposes.

¶ 50　　Finally, the Union argues, any nexus between the purported public interest and the arbitrator's award is tenuous, because the Tollway has many ways other than the discretionary documentation policy to ensure compliance with safe-driving regulations. For example, the Union notes, if a supervisor has a *bona fide* concern about an employee's fitness to work safely, the supervisor can send the employee home, order a fitness-for-duty examination, or require the employee to undergo drug and alcohol testing. Additionally, the employee has an affirmative obligation to notify the Tollway of any prescription medicines that could affect his ability to drive safely. Finally, the Union contends that, although motorist safety is "undoubtedly a priority" for the Tollway, there is no reason to infer that motorist safety "bears any connection whatsoever" to the short absences or minor illnesses at issue here.

¶ 51　　To resolve this issue, we start by examining cases in which the public-policy exception has been invoked, successfully and otherwise. In *AFSCME II*, DuBose, an employee of the Department of Children and Family Services (DCFS), filed a report in February 1990 stating that, earlier that month, she had seen three minor children in her care and they were " 'doing fine.' " *AFSCME II*, 173 Ill. 2d at 301. In actuality, the children had died in a fire at their home the previous month. *Id.* DCFS transferred DuBose for other reasons; after her replacement learned about the deaths, an internal investigation revealed that DuBose had failed to submit case plans for the family for the years 1988, 1989, and 1990. *Id.* After hearings, in October 1991, DCFS discharged DuBose and the matter proceeded to an arbitration hearing. *Id.* at 302.

¶ 52　　The union argued that the discharge could not stand, because DCFS had not timely disciplined DuBose as required by the parties' collective bargaining agreement. The arbitrator agreed and reinstated Dubose without deciding whether DCFS had lacked just cause to discharge her. DCFS appealed. *Id.* The trial court agreed with DCFS that the reinstatement of DuBose violated the public policy established in the Abused and Neglected Child Reporting Act (Reporting Act) (325 ILCS 5/1 *et seq.* (West 1994)), and it remanded for a final decision on the merits. *AFSCME II*, 173 Ill. 2d at 302-03. On remand, the union

- 13 -

stood on its argument that the disciplinary action had been untimely, and it did not address the merits. The arbitrator denied the grievance. *Id.* at 303. The union appealed; the trial court denied its petition. The appellate court reversed and held that the public-policy doctrine could not be applied, because DCFS had violated the agreement's time limits for bringing disciplinary proceedings. *Id.* DCFS appealed to the supreme court. *Id.*

¶ 53    The court agreed with DCFS that the arbitrator's award violated public policy. After noting that DCFS was not challenging the arbitrator's finding that it had violated the agreement's time provision (*id.* at 306), the court cautioned that the public-policy exception "is a narrow one and is invoked only when a contravention of public policy is clearly shown." *Id.* at 307.

¶ 54    The court noted that, in *Misco*, the Supreme Court held that the employer failed to make the required showing. *Id.* at 308. There, an employee, who operated dangerous machinery, was fired for violating the employer's policy against bringing illegal drugs onto company property. The factual basis for the finding was his presence on company premises in another person's car when that car was filled with marijuana smoke. *Misco*, 484 U.S. at 32-33. The arbitrator ordered the employee reinstated, holding that he had been fired without just cause, because there had been insufficient proof that he himself had used or possessed marijuana on company property. *Id.* at 34. The federal district court held that the reinstatement violated public policy. *Id.* at 34-35. The federal appellate court affirmed, holding that the reinstatement violated the public policy " 'against the operation of dangerous machinery by persons under the influence of drugs or alcohol.' " *Id.* at 35 (quoting *Misco, Inc. v. United Paperworkers International Union*, 768 F.2d 739, 743 (5th Cir. 1985)).

¶ 55    The Supreme Court reversed. The Court reiterated its statement in *W.R. Grace* that the public-policy exception requires a showing that the contract as interpreted would violate a well-defined and dominant public policy, as reflected by laws and legal precedents, and not merely be antithetical to general considerations of public interests. *Id.* at 43-44. The court of appeals had not based its conclusion on such a showing; indeed, it had not even reviewed existing laws and legal precedents to show that they established a well-defined and dominant policy against operating dangerous machinery while under the influence of drugs, although "such a judgment is firmly rooted in common sense." *Id.* at 44. (The Court also held that, even granting the existence of such a well-defined and dominant policy, no violation of the policy had been shown in the case. *Id.* at 45.)

¶ 56    The *AFSCME II* court also noted that, in *American Federation of State, County & Municipal Employees v. State*, 124 Ill. 2d 246 (1988) (*AFSCME I*), it had declined to vacate an arbitrator's decision to reduce two mental-health technicians' discharges to suspensions. The technicians had left their workplace, a facility for the mentally disabled, without authority; while they were gone, an unattended patient died. The patient had not been assigned to the ward where the technicians should have been on duty, which was why the arbitrator reduced their punishment. *AFSCME II*, 173 Ill. 2d at 310; see *AFSCME I*, 124 Ill. 2d at 262. The *AFSCME I* court explained that no public policy required discharging "all employees found guilty of mistreatment of a service recipient when the arbitrator expressly finds that the grievants were exemplary mental health employees, when punishment has been imposed, and when no nexis [*sic*] exists between the infraction and the patient's tragic death." *AFSCME I*, 124 Ill. 2d at 263.

¶ 57    On the other side of the ledger, the *AFSCME II* court noted several opinions in which courts vacated arbitration awards that had reinstated employees who were terminated for various forms of egregious misconduct. *AFSCME II*, 173 Ill. 2d at 308-10; see *Delta Air Lines, Inc. v. Air Line Pilots Ass'n, International*, 861 F.2d 665, 674 (11th Cir. 1988) (termination of pilot who flew commercial airliner while intoxicated; court noted that employer was under duty to prevent employee from violating standards that law clearly established); *Iowa Electric Light & Power Co. v. Local Union 204 of the International Brotherhood of Electrical Workers*, 834 F.2d 1424, 1429 (8th Cir. 1987) (nuclear power plant employee who got safety device disconnected so that he could leave area to go to lunch had violated federal regulatory scheme and thereby jeopardized public safety and thus could not be reinstated consistently with that policy); *United States Postal Service v. American Postal Workers Union*, 736 F.2d 822, 825 (1st Cir. 1984) (postal worker terminated for embezzling postal funds, violating public trust); *Board of Education of School District U-46 v. Illinois Educational Labor Relations Board*, 216 Ill. App. 3d 990 (1991) (school bus driver who was fired for unsafe driving violated well-defined public policy favoring safe transportation of school children).

¶ 58    The *AFSCME II* court turned to the facts before it. Applying the first prong of the public-policy test, the court stated, "the welfare and protection of minors has always been considered one of the State's most fundamental interests." *AFSCME II*, 173 Ill. 2d at 311. Indeed, the court had long recognized that the legislature has not merely the right but the duty to protect minors' welfare. *Id.*; see *County of McLean v. Humphreys*, 104 Ill. 378, 383 (1882). DCFS plays a central role in implementing this "compelling state interest." *AFSCME II*, 173 Ill. 2d at 312. Among the responsibilities that DCFS has are to assist the trial court throughout court proceedings, make reports, and file case plans regularly. *Id.* Thus, there exists a public policy of both timely contact with the children and accurately documented investigations of suspected child abuse and neglect. *Id.* at 316-17.

¶ 59    The court concluded that the arbitrator's award violated this public policy. The union had argued that it did not, because there was no positive law that prohibited DCFS from rehiring someone in DuBose's position. *Id.* at 319. The court rejected this narrow construction of the exception. The statutes involved did not explicitly prohibit rehiring a dishonest worker, because they presupposed that DCFS workers would be honest and trustworthy. *Id.* at 320-21. Employing untrustworthy workers would defeat the entire purpose of the statutory scheme. *Id.* at 321. The court also held that public-policy considerations overrode the effect of the agreement's time limits for imposing discipline. *Id.* Finally, the court rejected the argument of a dissent (*id.* at 336 (Heiple, J., dissenting)) that DCFS was required to show a nexus between the misconduct and the harm suffered. *Id.* at 332 (majority opinion).

¶ 60    Numerous other opinions, from Illinois and elsewhere, address the public-policy doctrine. As in the cases we have noted so far, they arise in the context of the discharge or punishment of an employee and consider whether the reinstatement (or lessened punishment) of the employee violated public policy. Much more difficult to find is a case such as this one, in which an employer argues that striking down a rule of employee conduct violates public policy even though no employee has committed a wrong or been disciplined.

¶ 61    We do note, however, that in *City of Stamford v. Stamford Police Ass'n*, 540 A.2d 400 (Conn. App. Ct. 1988), a police officer who was blind, with little hope of recovering his sight, was terminated from extended-sick-leave status. He and the defendant union filed a

grievance; the arbitrators agreed with them that the plaintiff municipality had violated the parties' collective bargaining agreement, which did not provide for terminating the extended-sick-leave status of an officer. *Id.* at 401. The plaintiff appealed, arguing that the award violated public policy. Specifically, it contended, because it could not replace the officer on disability with officers who were capable of performing his duty, the reinstatement of the officer to extended sick leave undermined the public policy of providing public safety. *Id.*

¶ 62    The trial court rejected the plaintiff's argument, and the court of appeals agreed with the trial court. The court of appeals stated that "the fact that police officers are engaged in the important field of public safety" and the fact that public confidence in the police is a matter of public concern could not override the officer's contractual right to unlimited sick-leave benefits. *Id.* The court did not deny that the plaintiff would be unable to fill the officer's position in the field, but this possible harm "simply [did] not rise to the level of a violation of public policy." *Id.* at 402.

¶ 63    Although *City of Stamford* differs greatly on its facts from our case, it does illustrate the principle that proving a violation of public policy requires more than making a plausible argument that the public will suffer some sort of harm from the enforcement of an arbitration award. In *AFSCME II*, and in the cases that it cited in which awards were overturned on public-policy grounds, the awards amounted to condoning blatant and specific violations of established policies and in effect to enabling future violations by employees who had demonstrated their proclivities to gross unfitness or illegality. The possibility of harm arising indirectly from the enforcement of the award appears to be insufficient, even if it is possible to state that this harm is contrary to some sort of general public policy or public interest.

¶ 64    Here, the two-day "grace period" does not violate public policy and, as the arbitrator's interpretation of the CBA, it must stand. Eliminating supervisors' discretion to require explanations and clearances after short sick leaves is far from tantamount to condoning or making inevitable violations of the traffic laws. A short leave of absence does not create a presumption that the returning employee is medically unfit to fulfill his duties. (Also, an employee who has not been out on sick leave is not automatically fit; he might also be fatigued or on prescription medicine.) More important, as the Union has pointed out, there are numerous ways to address the problem without rewriting the CBA as the arbitrator construed it: a supervisor who doubts an employee's fitness can send him home, order an examination, or require testing. Thus, preserving the two-day grace period does not violate the public policy embodied in the federal regulations and state statute that the Tollway cites.

¶ 65    Notably, the Tollway made little effort at the arbitral or trial level to support its public-policy argument with data or even plausible speculation that short absences are correlated with unfitness to work upon return or that alternative means of ensuring worker fitness are inferior to the wholly discretionary option of requiring medical clearances. On this record, we cannot say that the Tollway has supported its invocation of the narrow public-policy doctrine.

¶ 66    For the foregoing reasons, we reverse the judgment of the circuit court of Du Page County, and we reinstate the arbitrator's award.

¶ 67    Reversed.